UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re Elsa Mary Perez,                    Case No.   04-08011-8W7
                                          Chapter 7
        Debtor.

_____/

## MEMORANDUM DECISION ON DEBTOR'S
## MOTION TO REDEEM COLLATERAL

        In a case under chapter 7 in which the debtor is an

individual, the debtor has the right under section 722 of

the Bankruptcy Code to redeem exempt tangible personal

property from a lien by paying the holder of such lien the

amount of the allowed secured claim that is secured by such

lien. In this case, the Debtor, Elsa Mary Perez ("Debtor"),

proposes to redeem her automobile by paying its wholesale

value determined as of the date of the hearing on the

motion to redeem. The creditor that holds the lien, Ford

Motor Credit Company ("Ford Credit"), objects to the

Debtor's proposed redemption, arguing that the vehicle

should be valued based on the fair market value as of the

date of the Debtor's petition commencing her bankruptcy

case. For the reasons set forth below, the Court overrules

the creditor's objection and concludes that the wholesale

value determined as of the date of the hearing on the

motion to redeem is the appropriate value for purposes of a debtor's redemption of personal property under section 722.

Conclusions of Law

The court has jurisdiction over this matter pursuant to 28 U.S.C. sections 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2)(A), (K), and (O).

A.   *Section 506 and Rash*.

In order to redeem personal property from a lien, section 722 requires the debtor to pay to the secured creditor "the amount of the allowed secured claim" secured by the lien. 11 U.S.C. § 722.  Bankruptcy Code section 506 is the provision that governs valuation of collateral securing claims against property of the estate. In this regard, section 506(a) provides in pertinent part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim. **Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.**

11 U.S.C. § 506(a) (emphasis added).

Creditors often argue, as Ford Credit has done in this case, that the Supreme Court's holding in *Associates Commercial*

*Corp. v. Rash*, 520 U.S. 953, 117 S. Ct. 1879, 138 L. Ed.2d 148 (1997), is directly applicable to redemptions under chapter 7 and mandates that valuations for purposes of section 722 redemptions be based on what the debtor would pay to obtain like property for the same proposed use (the "replacement-value standard"). *Rash*, 520 U.S. at 955-56. While this Court agrees that *Rash* is applicable to the manner in which bankruptcy courts must apply section 506, the Court concludes that just as *Rash* mandates the use of a replacement value in the context of cram down under chapter 13 (the situation presented in *Rash)*, *Rash* mandates the use of a wholesale value[1] in the context of redemptions under chapter 7.

Nowhere in *Rash* does the Supreme Court hold that all valuations under section 506 must be based on a replacement value standard. Rather, *Rash* was decided entirely in the context of a debtor's exercise of the "cram down" option available in a chapter 13 case under Bankruptcy Code section 1325(a)(5)(B). Specifically, the Supreme Court in *Rash* held that " …when a debtor, over a secured creditor's objection, seeks to retain and use the creditor's collateral in a Chapter 13 plan … § 506(a) directs application of the replacement-value standard…" as

---

[1] For purposes of valuation of the Debtor's automobile in this case, the Court considers the terms "liquidation value," "foreclosure-value," and "wholesale value," to be synonymous and to represent the low end of the valuation spectrum with "replacement value" or "fair market value" to represent the high end of the automobile's value.

3

opposed to "what the secured creditor could obtain through foreclosure sale of the property (the 'foreclosure-value' standard)…." *Rash*, 520 U.S. at 955-56.

In *Rash*, the Supreme Court first analyzes section 506(a) in isolation, and then analyzes its application to the specific case before it. In this regard, the Supreme Court initially notes that the words of the first sentence of section 506(a) -- "the creditor's interest in the estate's interest in such property" -- "imparts no valuation standard: A direction simply to consider the 'value of such creditor's interest' does not expressly reveal how that interest is to be valued." *Rash*, 520 U.S. at 961. "The full first sentence of § 506(a), in short, tells a court what it must evaluate, but it does not say more; it is not enlightening on how to value collateral." *Id*.

With respect to the balance of 506(a) contained in the second sentence, the Supreme Court then explains: "The second sentence of § 506(a) does speak to the how question. 'Such value,' that sentence provides, 'shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.'" *Id*. As set forth by the Supreme Court in *Rash,* the proposed "disposition or use" is of "paramount importance to the valuation question." *Id*. at 962. Given this statutory direction, the Supreme Court then analyzes the question of the standard for valuation in the context in which

4

the *Rash* case arises – a chapter 13 debtor's exercise of the cram down option with respect to treatment of a secured claim. Under this option, the debtor may keep the collateral over the creditor's objection so long as the creditor is provided with the equivalent of the present value of the collateral over the life of the plan. 11 U.S.C. § 1325(a)(5)(B).

As a result, under the cram down option the creditor is exposed to "double risks" in that the debtor keeps the collateral under a court-imposed "crammed down" financing arrangement. That is, the "debtor may again default and the property may deteriorate from extended use." *Id.* at 962-963. Use of the replacement standard in such instances is mandated by section 506 because it values "'the creditor's interest in the collateral in light of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to ... its [replacement] value." *Id.* (citing *In re Winthrop Old Farm Nurseries*, 50 F.3d 72, 75 (1st Cir. 1995)). "That actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'" *Id.*

As explained in *Rash,* the court-imposed payment terms available to a debtor under the cram down provisions of chapter 13, "displaces a secured creditor's state-law right to obtain immediate foreclosure upon a debtor's default." *Id.* at 964. It

is in this context that the Supreme Court recognizes that this "disposition or use" by the debtor requires a valuation standard based on replacement value of the collateral. Because the secured creditor is receiving back neither the collateral nor its proceeds, liquidation value is not relevant to the debtor's intended use or disposition in the context of a cram down under chapter 13. *Id*. at 962-63.

B.   *A Chapter 7 Debtor's Options under Section 521*.

Bankruptcy Code section 521 sets forth the duties of a debtor who seeks the benefit of a discharge under Chapter 7. With respect to the trustee's obligation to liquidate property of the estate, the debtor is required to facilitate this process by turning over to the trustee for purposes of liquidation any property of the estate that has not been allowed as exempt. 11 U.S.C. §§ 521(4) and 522(b). Section 521(3) deals separately with the situation that arises where the debtor's property is subject to a lien -- typically the purchase-money financing incurred when the property was purchased. The most common example of this is the one before the Court in this case -- the debt securing the debtor's purchase of an automobile. Typically, as is also the situation in this case, there is no equity in the automobile, that is, the amount of the debt exceeds the value of the automobile. Under such circumstances, the property is allowed as exempt and is no longer property of the estate. In

such cases, there is no obligation on the debtor's part to turn the automobile over to the trustee. However, the debtor still is obligated under section 521 to deal with the secured creditor holding the lien on the automobile.

Specifically, section 521 gives an individual debtor three options with respect to property that is collateral for a consumer loan where the property is exempt and not property of the estate. These options are: (1) redemption under section 722, (2) reaffirmation of the debt under section 524(c), or (3) to simply surrender the property to the secured creditor. *See Taylor v. AGE Fed. Credit Union (In re Taylor)*, 3 F.3d 1512, 1516 (11th Cir. 1993); *In re Waters,* 248 B.R. 916, 917-918 (Bankr. M.D. Fla. 2000). The circumstances of the debtor's financial situation and the value and nature of the personal property typically dictate the debtor's choices. In Central Florida, the prevalent method of transportation is the automobile. Accordingly, surrender of an automobile is not a favored choice, occurring typically in the occasional case where the debtor has recognized that the car payments are simply beyond the budget of the debtor or, more often, where the debtor has fallen hopelessly behind in the payments and has no means to catch up.

While redemption under section 722 does leave a debtor with the automobile, it is also rare that this option is exercised

because it requires the debtor to pay cash equal to the value of the automobile. Because the typical debtor has just filed for bankruptcy and turned over all of the debtor's non-exempt assets to the trustee for liquidation, most debtors simply do not have a ready source of cash to exercise the option of a redemption under section 722.

In this Court's experience, the most likely option to be exercised by a chapter 7 debtor is retention of the automobile under a reaffirmation agreement with the creditor. Secured creditors actively seek such reaffirmation agreements, often filing motions to compel the debtor to reaffirm their automobile financing agreements. Similar to the cram down option of a chapter 13, in agreeing to enter into a reaffirmation agreement, the secured creditor assumes the "double risks" of further default by the debtor and deterioration of the property from extended use.   *Rash,* 520 U.S. at 962-963. However, unlike the situation arising in a cram down under chapter 13, the full amount of the indebtedness is reaffirmed and is not discharged in bankruptcy. This leaves in place the financing that was originally agreed to when the car was purchased. The advantage to the debtor is retention of the automobile, albeit with no discount as would be available under a chapter 13 cram down or redemption under section 722.

8

C.   *Redemption under Section 722.*

In this case, the Debtor has decided to exercise the option to redeem her automobile under section 722 "from a sale to enforce a lien in accordance with applicable law." Fed. R. Bankr. P. 6008 ("Redemption of Property from Lien or Sale"). This Court must, therefore, determine the value of the automobile in light of "the purpose of the valuation and of the proposed disposition…" of the automobile, which in this case is redemption under section 722. 11 U.S.C. § 506(a). More specifically, is a redemption more similar to a cram down under a chapter 13, making the replacement standard applicable, or is it more similar to "what the secured creditor could obtain through foreclosure," making the "foreclosure-value" applicable? *Rash*, 520 U.S. at 955-56.

It is clear to the Court from a reading of *Rash* that it was the debtor's use of the chapter 13 cram down provision, "…to retain and use the creditor's collateral in a Chapter 13 plan…" that resulted in the Supreme Court's direction that the replacement value standard be applied. *Rash*, 520 U.S. at 955-56. It is through the chapter 13 cram down that the creditor is exposed to "double risks" in that the debtor keeps the collateral under a court imposed "crammed down" financing arrangement. That is, the "debtor may again default and the property may deteriorate from extended use." *Id.* at 962-963.

9

The situation in a redemption is the opposite from that present in a chapter 13 cram down. In a redemption, there is no exposure to the "double risks" of future default and further deterioration of the collateral. "The true underpinning of *Rash* is its focus on the 'double risk' of a debtor's retention of property in a Chapter 13 case and payment of the value of the creditor's allowed secured claim over time." *In re Smith*, 313 B.R. 785 (Bankr. N.D. Ind. 2004). Rather, just as in a foreclosure sale, the secured creditor realizes the foreclosure value of the automobile.

In essence, a section 722 redemption is the functional equivalent of a surrender of the automobile followed by a public liquidation auction at which the debtor appears, bids at the auction, and purchases the automobile for its liquidation value as determined by the market place -- a foreclosure sale -- on the date of the sale. To the advantage of the secured creditor, section 722 avoids time and expense inherent in the foreclosure process. These avoided expenses stem from the need in a repossession to take the automobile into the possession of the secured creditor who then incurs storage charges and auction expenses. *In re Weathington,* 254 B.R. 895, 900 (6th Cir. B.A.P. 2000) ("... it is likely that when a debtor pays the creditor the liquidation value of a vehicle to redeem it, the creditor

may actually receive more money than if it had repossessed the vehicle.").

All of these expenses are avoided to the benefit of the secured creditor when the court authorizes the debtor to redeem the collateral. Functionally, in all other respects, the redemption under section 722 parallels the process of liquidating the collateral under Article 9 of the Uniform Commercial Code. *In re Weathington,* 254 B.R. 895 (6th Cir. BAP 2000)("In contrast to the Chapter 13 cram down scenario described in *Rash,* there is no distinction in the economic consequences to the creditor between surrender and redemption in Chapter 7.").

*Rash,* therefore, mandates that the creditor's interest in the collateral be valued in light of the proposed redemption reality: That is, the functional equivalent of a foreclosure sale will take place, and that is the "proper guide" under a prescription hinged to the property's "disposition or use" for purposes of valuation under section 722 redemption. *Rash,* 520 U.S. at 962-63. *See also In re Tripplett,* 256 B.R. 594, 598 (Bankr. N.D. Ill. 2000)("...the impact of redemption is much closer to surrender than to cram down, and *Rash* cannot reasonably be read to mandate replacement value in the redemption context.").

Of comfort to this Court in reaching this conclusion is the apparent unanimity of all of the reported cases, which have reached the same conclusion in applying the "wholesale/liquidation-value standard" as the appropriate standard for valuing collateral in Chapter 7 redemption cases. *See, e.g., In re Weathington*, 254 B.R. 895 (6th Cir. BAP 2000); *In re Smith*, 313 B.R. 785 (Bankr. N.D. Ind. 2004); *In re Neal*, 2004 WL 2032319 (Bankr. N.D. Iowa 2004); *In re Barse*, 309 B.R. 109 (Bankr. W.D.N.Y. 2004); *In re Bouzek*, 311 B.R. 239 (Bankr. E.D. Wis. 2004); *In re Washington*, 2003 WL 22119519 (Bankr. E.D. Ark. 2003); *In re Podnar*, 307 B.R. 667 (Bankr. W.D. Mo. 2003); *In re Zell*, 284 B.R. 569 (Bankr. D. Md. 2002); *In re Ard*, 280 B.R. 910 (Bankr. S.D. Ala. 2002); *In re Dobler*, 2002 WL 31342412 (Bankr. D.N.D. 2002); *In re Ballard*, 258 B.R. 707 (Bankr. W.D. Tenn. 2001); *In re Tripplett*, 256 B.R. 594 (Bankr. N.D. Ill. 2000); *In re Russell*, 2000 WL 33673802 (Bankr. M.D.N.C. 2000). *See also* 6 Lawrence P. King et al., *Collier on Bankruptcy*, ¶ 1722.05, at 722-9 (15th ed. rev. 2000) (interpreting § 722 to require liquidation valuation of secured claims). In addition, the only apparent decision to adopt the "replacement-value standard" in the context of redemption was quickly reversed and supplanted with the "wholesale/liquidation-value standard." *See Smith v. Household Automotive Finance Corporation*, 313 B.R. 267

(N.D. Ill. 2004), *reversing In re Smith*, 307 B.R. 912 (Bankr.
N.D. Ill. 2004).

   D.   *Legislative History of Section 722*.

   This Court's conclusion that wholesale value is the
appropriate standard in the context of redemptions under section
722 does not depend on the legislative history of that section.
This Court is mindful that any exercise of statutory
interpretation begins first with the language of the statute in
question. *Nat'l Coal Ass'n v. Chater*, 81 F.3d 1077, 1081 (11th
Cir. 1996). As a general proposition, a court should not resort
to legislative history when statutory text is clear. *Midrash
Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226 (11th
Cir. 2004). It is only when a statue is vague or ambiguous that
"other interpretative tools may be used, including an
examination of the act's purpose and of its legislative
history." *U.S. v. Pringle*, 350 F.3d 1172, 1180 n. 11 (11th Cir.
2003).

   While this Court views sections 506 and 722 in light of
*Rash* not to require a resort to legislative history, a number of
courts have viewed these statutory provisions as "not clearly
and explicitly" setting forth the property valuation method,
making legislative history an appropriate area of inquiry. *See,
e.g., In re Weathington*, 254 B.R. at 900. It is noteworthy that
the cases that have reviewed the pertinent legislative history

have concluded that it clearly supports the "wholesale/ liquidation value standard," as opposed to the "replacement value standard."

As indicated in the Congressional Statement to the Bankruptcy Code, it was the House version of section 722 that was used rather than the version contained in the companion bill passed by the Senate. Editor's Comment, Norton Bankruptcy Law and Practice 2d., *Bankruptcy Code and Related Legislative History* (Thompson West 2003), at 821. It is significant that the Senate version adopted a markedly different approach to redemption under section 722. The primary differences between the two versions were: (i) under the Senate version, redemption was not available when the debt was purchase-money debt (the situation in the great majority of cases in current practice), and (ii) the Senate version would have required the debtor to pay an amount equal to the greater of the fair market value of the goods or the amount of the total outstanding balance. *Id.*

The House version, which was adopted and is now contained in section 722, takes an entirely different approach. As described in the legislative history that accompanied the House version, "The provision amounts to a right of first refusal for the debtor in consumer goods that might otherwise be repossessed." H.R. Rep. No. 95-595 ("House Report")(1977), at 380-381. It creates a power of redemption in the debtor to

counter the threat of foreclosure used by secured creditors to obtain a reaffirmation of a debt. House Report, at 127-128.

But for this power of redemption, the secured creditor would be able to deprive a debtor of even the most insignificant household effects even though the items have little if any realizable market value. *Id*. "However, the goods do have a high replacement cost, and thus the creditor is able to use the threat of repossession, rarely carried out, to extract more than he would be able to if he did foreclose or repossess." *Id*. This right of redemption as embodied in the House version "amounts to a right of first refusal on a foreclosure sale of the property involved." *Id*. Applied to a case such as this one, it allows the Debtor to retain a necessary item of property, an automobile, and "avoid high replacement costs." *Id*. The secured creditor, under such circumstances, is still not prevented "from obtaining what he is entitled to under the terms of the contract" that being the right to receive the proceeds from liquidation in the form of a cash payment from the debtor as determined by the court. *Id*.

It is clear, therefore, that a review of the pertinent "legislative history clearly demonstrates the Congressional intent that in the redemption context, a creditor should be paid the same amount that it would have been paid if the property were repossessed and sold." *In re Weathington*, 254 B.R. 895,

900. Accordingly, as the cases reviewing this legislative history point out, the use of the "replacement-value standard" would circumvent the clear intent Congress had when enacting section 722 and undermine the proposed purpose of the legislation to "avoid high replacement costs." *Id. See also In re Podnar*, 307 B.R. 667, 671 (Bankr. W.D. Mo. 2003); *In re Tripplett*, 256 B.R. at 598.

    E.   *Effective Date of Valuation*.

    Having determined that the wholesale method is the appropriate method for valuing collateral pursuant to section 722, the Court turns to the second area in which Ford Credit and the Debtor disagree as to the applicable standard: What date should control for purposes of valuation of the collateral? Ford Credit argues for the earlier date of the date of the petition commencing this chapter 7 case. The Debtor argues for the later date of the hearing on the contested redemption motion.

    An analysis of this issue must be done in light of how a chapter 7 works in the context of a secured creditor's rights with respect to its collateral. Upon commencement of the chapter 7 case, all of the debtor's property becomes property of the bankruptcy estate. 11 U.S.C. § 541. Any act to enforce a lien against property of the estate is stayed. 11 U.S.C. § 362(a)(4). The secured creditor may seek relief from the automatic stay to proceed to repossess and foreclose on its

16

collateral. While such motions are heard quickly by the
bankruptcy court, generally within 30-60 days of their filing,
further delays are inherent in the process of foreclosure and
liquidation resulting from the steps that a secured creditor
must take under applicable non-bankruptcy law to realize on its
collateral.

Given the time-consuming sequence of events, valuing the
collateral as of the date of the petition puts Ford Credit in a
better position than if the Debtor had elected not to redeem but
to have surrendered the collateral. If that had occurred, Ford
Credit would have had to repossess the vehicle after obtaining
relief from stay. As noted by the court in *Podnar*, "a creditor's
repossession and sale of collateral is also attendant with delay
in liquidating the property." *In re Podnar*, 307 B.R. at 673.
Valuing the property as of the date of the petition "would
always place the secured creditor in a better position than it
would be if it were allowed to repossess in the ordinary course
of events. *Matter of Pierce*, 5 B.R. 346, 347 (Bankr. Neb. 1980).
"Valuation at the time of the hearing, therefore, reflects a
more realistic approach." *Van Holt v. Commerce Bank of Bolivar
(In re Van Holt)*; 28 B.R. 577, 578 (Bankr. W.D. Mo. 1983). *See
also In re Henderson*, 235 B.R. 425, 428  (Bankr. C.D. Ill.
1999);  *In re Lopez*, 224 B.R. 439, 444 (Bankr. C.D. Ca. 1998);
*In re King*, 75 B.R. 287, 290 (Bankr. S.D. Ohio 1987).

F.   *Conclusion*.

It is clear to the Court, that when viewed in light of the plain wording of the relevant Bankruptcy Code sections, 506 and 722, the guidance provided by the Supreme Court in *Rash,* and the overwhelming consistency in the case law, that the wholesale value determined as of the date of the hearing on the motion to redeem is the appropriate value for purposes of a debtor's redemption of personal property under section 722.

A separate order shall be entered consistent with this opinion.

DONE AND ORDERED in Tampa, Florida, on ___JAN - 3 2005___.

Honorable Michael G. Williamson
United States Bankruptcy Judge

Copies to:

Debtor:
Elsa Mary Perez
1467 Grove Circle Court
Clearwater, FL  33755-2019

Counsel for Ford Motor Credit Company:
Larry M. Foyle, Esq.
Brad W. Hissing, Esq.
Kass, Shuler, Solomon, Spector,
 Foyle & Singer, P.A.
P.O. Box 800
Tampa, FL  33601-0800

F:\WORDWILL\CASES\Perez\722 Opinion v7.doc